Karen L. **ERICKSON, Plaintiff–Appellee,**

v.

**TRINITY THEATRE, INC., individually and d/b/a Trinity Square Ensemble, et al., Defendants–Appellants.**

No. 92–3598.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1993.

Decided Jan. 6, 1994.

here.

1062

Theatre d/b/a/ Trinity Square Ensemble ("Trinity") from performing three plays and using two videotapes to which she owned the copyrights. The magistrate judge recommended enjoining the performance of the plays but not the use of the videotapes. Both parties filed objections. The district court sustained Ms. Erickson's objections to the portions of the recommendation addressing the videotapes but denied Trinity's objections to the portion of the recommendation addressing performance of the plays. Accordingly, the district court enjoined Trinity from using either the plays or the videotapes. Trinity now appeals. We now affirm.

I

BACKGROUND

A. Facts [1]

Ms. Erickson was one of the founders of a theatre company in Evanston, Illinois, that ultimately became known as Trinity Theatre. Between 1981 and January 1991, Ms. Erickson served Trinity in various capacities: as playwright, artistic director, actress, play director, business manager, and member of the board of directors. This suit revolves around Ms. Erickson's role as playwright.

At issue here are the rights to three plays: *Much Ado About Shakespeare* ("*Much Ado*"); *The Theatre Time Machine* ("*Time Machine*"); and *Prairie Voices: Tales from Illinois* ("*Prairie Voices*"). *Much Ado* is a compilation of scenes and sonnets from William Shakespeare and other writers of his time. Ms. Erickson revised this work from an earlier script entitled *Sounds and Sweet Aires.* Michael Osborne, a Trinity actor, testified that Ms. Erickson compiled *Much Ado* in 1988 and that many decisions about what was to be included were made during rehearsals. Osborne identified two portions of the copyrighted script that resulted from his suggestions: a passage to *Macbeth* and the

Patricia A. Felch (argued), Artslaw Offices of Patricia A. Felch and Terence E. Flynn, Gessler, Flynn, Fleischmann, Chicago, IL, for plaintiff-appellee.

David R. Herzog, Layfer, Cohen & Handelsman and Thomas I. Ross (argued), Hill, Steadman & Simpson, Chicago, IL, for defendants-appellants.

Before RONEY,* COFFEY, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiff Karen Erickson brought this action seeking a preliminary and permanent injunction to prevent the defendant Trinity

---

* The Honorable Paul H. Roney, Circuit Judge for the Eleventh Circuit, is sitting by designation.

1. The defendant filed objections only to the magistrate judge's legal analysis, and conceded that the factual findings accurately reflected the evidence presented at the hearing on the plaintiff's motion. The district court overruled the plaintiff's limited objections to the magistrate judge's factual findings, and the plaintiff has not contested the court's ruling. Thus, we incorporate the magistrate judge's undisputed factual findings.

introduction to the play. The editing of the text, Osborne continued, was accomplished largely by consensus; however, when a consensus could not be had, Ms. Erickson made the final decisions. Osborne further testified that he understood at the time that the play was being created for Trinity and not for Ms. Erickson. Ms. Erickson does not dispute the process described by Osborne, but characterizes it differently. She perceived the process only as actors making suggestions for her script.

*Time Machine* is a play of five scenes based on a public domain Native American folk tale. Each scene depicts dramatic styles from different historical periods. Ms. Erickson received a copyright registration for *Time Machine* on September 12, 1988. She described the development of the play as beginning in 1977 when she was in school. At that time, she wrote the Greek-style drama scene. Later, while teaching high school drama, she wrote the second scene based on *commedia dell'arte*. She also began work on the melodrama and improvisational scenes of the play at that time. Ms. Erickson started producing the play independently of Trinity in 1984 with two other actors, Paddy Lynn and Will Clinger. Ms. Erickson claimed that she worked to develop the scenes alone; however, the evidence shows that the actors were involved in the development of the melodrama and improvisational scenes. The improvisational process, as described by Ms. Lynn, is a form of theatre in which there is no script. Rather, actors work with an idea and a loose structure to create a play. Ms. Lynn described the development of the improvisational scene in *Time Machine* as a collaborative effort. However, she conceded that Ms. Erickson took all of the notes from rehearsals and compiled them into the script; furthermore, nothing was included in the script without Ms. Erickson's approval. Initially, Ms. Erickson attributed the script to both herself and to Ms. Lynn. Ms. Lynn also received royalties for performances of the play. Ms. Erickson denied that she ever intended to include Ms. Lynn as joint author. She conceded that Ms. Lynn was credited on publicity materials as an author but denied that she approved such credit. The later

change in attribution, Ms. Erickson claims, merely corrected the initial error.

In 1990, Ms. Erickson developed *Prairie Voices*, a play based on tales from Illinois history. She had the idea to develop the play as a Trinity production. Her original intent was to launch a collaborative effort in which each of the actors would contribute a story to the play. However, none of the actors initiated writing a script and the play, as it resulted, was based entirely on tales provided by Ms. Erickson. As with *Time Machine*, Ms. Erickson worked with the actors in the improvisational format. Although testifying that she alone wrote the play, Ms. Erickson admitted that the actors provided ideas for the dialogue. Another actor, Ruth Ann Weyna, testified that the writing of the play was a creative process involving a number of actors. However, she conceded that Ms. Erickson controlled what eventually was put in the script.

In 1987, Trinity began paying Ms. Erickson royalties for its performances of her plays. On July 5, 1988, Ms. Erickson entered into a two-year licensing agreement with Trinity that designated her as a "playwright" entitling her to royalties for performances of two of her plays, *Much Ado* and *Time Machine*. Trinity stipulated that it also paid Erickson royalties for its performances of *Prairie Voices*, although that play was not expressly covered by the licensing agreement. Trinity continued to pay Ms. Erickson royalties after the expiration of the licensing agreement. Trinity discontinued making royalty payments on November 15, 1990.

Ms. Erickson was also subject to an actors' agreement with Trinity. In July 1988, Ms. Erickson signed the agreement which stated: "The actor expressly agrees that Trinity reserves the rights to any recording, audio, video or both of the Production...." The contract covered the tour which was forecast to run through June 30, 1989.

Ms. Erickson left Trinity Theatre in January 1991. Shortly thereafter, she applied for and was issued copyright registration for *Much Ado* and *Prairie Voices*. Concurrently, she received registration for the video productions of *Time Machine*, taped in Octo-

ber 1989, and *Prairie Voices,* taped in November 1990. She had previously obtained a copyright certificate for *Time Machine* on September 12, 1988. On January 21, 1991, Ms. Erickson's attorneys wrote Trinity a letter demanding that the theatre discontinue performing the plaintiff's plays. Trinity refused to comply with the request.

On April 3, 1991, Ms. Erickson filed a seventeen-count complaint against Trinity Theatre, members of Trinity's management, and individual Trinity actors seeking injunctive and legal relief in which she alleged copyright infringement, unfair competition, and other related tortious activity. In October 1992, Ms. Erickson filed a motion for a preliminary injunction to prevent the defendant from producing or performing five plays for which Ms. Erickson claimed exclusive copyright ownership, from displaying videotapes, photographs, and brochures regarding these plays, and from reproducing any materials from a copyrighted work entitled "Drama/Learning Process." After a partial settlement agreement, the parties stipulated that the district court did not need to resolve the plaintiff's request for injunctive relief as to two of the five plays. As a result, the only plays at issue for purposes of the plaintiff's motion for preliminary injunction were *Time Machine, Much Ado,* and *Prairie Voices,* as well as videotapes of *Time Machine* and *Prairie Voices.*

### B. *Prior Proceedings*

#### 1.

The magistrate judge reviewed the elements necessary to issue a preliminary injunction but focused her analysis, by agreement of the parties, on the likelihood of success on the merits.

The magistrate judge briefly reviewed the elements of copyright infringement. Because a valid copyright registration had been made within the requisite time, the burden would be on Trinity to show the invalidity of the registration. *See Rand McNally & Co. v. Fleet Management Sys. Inc.,* 591 F.Supp. 726, 737 (N.D.Ill.1983). It could either demonstrate that the material was copied from another source or dispute the authorship of the material itself. In this case, continued the magistrate judge, Trinity challenged the authorship itself. Trinity claimed that several of its members were joint authors of the three plays with Ms. Erickson, that these joint authors gave Trinity the right to produce the plays, and therefore that Trinity and its member joint authors share rights to the plays and videotapes.

The magistrate judge was faced with an issue of first impression in this circuit: establishing the appropriate test for determining whether a work has been prepared as a "joint work" within the meaning of § 101 of the Copyright Act of 1976, 17 U.S.C. § 101 (1988).[2] The parties suggested different approaches. Trinity maintained that the standard for determining a joint work is "collaboration alone"; because there was collaboration between Ms. Erickson and its members, its members jointly authored the three plays at issue and share rights to their use and production. Ms. Erickson contended that the appropriate test for a joint work is the "copyrightable subject matter" test. Under the test suggested by Ms. Erickson, none of the plays were joint works because only she was an author; the other actors had not contributed independently copyrightable subject matter.

The magistrate judge's report and recommendation concluded that the district court should enter a preliminary injunction in favor of Ms. Erickson concerning the plays. The magistrate judge stated that "[a] determination as to joint authorship involves an examination of the putative authors' intent at the

---

**2.** Section 101, the definitional section of the Copyright Act, defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

Authors who create a joint work are co-owners of the copyright in that work. 17 U.S.C. § 201(a). Each author has "an independent right to use or license the use of a work, subject to a duty of accounting to the other co-owners for any profits." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 121 (1976) ("House Report"), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736. Although different members of Trinity allege to be joint authors with Erickson on the three plays, all of these witnesses testified that they gave Trinity the right to perform the plays.

time the work is produced." Report and Recommendation at 17. The magistrate judge followed primarily the Second Circuit's test in *Childress v. Taylor*, 945 F.2d 500, 505–06 (2d Cir.1991), which identified two elements of joint ownership: (1) the contribution of each joint author must be copyrightable and (2) the parties must have intended to be joint authors. With regard to the second element, the *Childress* court stated that the putative joint authors must entertain in their minds "the concept of joint authorship." *Id.* at 508. Using this analysis, the magistrate judge determined that Ms. Erickson was likely to prevail on her claims regarding the three plays. With regard to *Prairie Voices*, the evidence was clear that Ms. Erickson controlled the script and that the contributions of the actors were not copyrightable. Even if it was not necessary to show that a contribution was independently copyrightable in order to establish joint ownership, the actors' inability to specify any particular contribution was strong evidence that they were not authors of the play. Furthermore, Ms. Erickson never intended to share authorship with any of the actors.

The magistrate judge found similarly with respect to *Much Ado*. However, the magistrate judge termed the decision with respect to *Time Machine* "more problematic." She continued:

> The intent portion of plaintiff's proof requires resolution of the credibility of Erickson as contrasted with Paddy Lynn in their respective testimony.... I conclude that Paddy Lynn is more credible than Karen Erickson on this issue. In light of Erickson's pivotal role and her apparent control over a very small organization, I find it unlikely that she would have permitted the publicity material ... to be published crediting Lynn as author if she did not acknowledge her as author.

Report and Recommendation at 25. The magistrate judge then stated that the decision probably turns on whether or not the contribution must be copyrightable. The magistrate judge concluded, however, that even in this respect, Ms. Erickson had met the threshold of a "better than negligible" chance of succeeding on the merits. *Roland*

*Mach. Co. v. Dresser Indus., Inc.,* ·749 F.2d 380, 387 (7th Cir.1984). The magistrate judge therefore balanced the harms and the public interest, and she determined that the strong public policy interest in protecting copyrights favored issuance of a preliminary injunction here. *See Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir.1983) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections...."), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

The magistrate judge also addressed the claims as to the videotapes. Here, she stated, Ms. Erickson had not shown that she was likely to succeed on the merits of her claim of copyright infringement. Specifically, the magistrate judge decided that Ms. Erickson had released her rights to the use of those in the actors' agreement.

### 2.

Both parties filed objections to the magistrate judge's recommendation. Trinity objected to the criteria for preliminary injunctions used by the magistrate judge. It also objected to the criteria for joint authorship applied by the magistrate judge when analyzing the parties' competing arguments as to Trinity's entitlement to joint author status. Ms. Erickson objected to the characterization of her claim concerning *Time Machine* as "more problematic." She also objected to the magistrate judge's recommendation regarding the videotape claims.

The district court found that Trinity had waived its argument concerning the standard for preliminary injunctions because the parties had agreed that the likelihood of success issue would determine the outcome of the hearing. However, continued the court, assuming that there was no waiver, the magistrate judge had not limited her analysis to this element. Instead, she had recognized that the "better than negligible" standard was an initial threshold Ms. Erickson must meet. After this hurdle was met, the magistrate judge proceeded with the remaining preliminary injunction analysis. Consequently, the district court concluded, there was no error.

The district court then turned to the question of joint ownership. The court examined the two competing tests: (1) the *Childress* standard, which requires both copyrightability and intent to be joint authors, and (2) the "collaboration test." "The major difference between the approach[es] is that the latter does not require each of the putative joint authors' contributions to be independently copyrightable." Opinion at 10. Noting that the Seventh Circuit had yet to choose between the approaches, the district court did not choose between the two alternatives. It noted instead that under either standard, the plaintiff was likely to prevail on the merits. Specifically, even if the "collaboration alone" test were the correct standard, there would need to be a "de minimis collaboration." Because the actors' contributions were less than de minimis, Trinity could not prevail. The district court went on to overrule Ms. Erickson's objections concerning the characterization of her claims regarding *Time Machine.*

Finally, the district court addressed the issue of the videotapes. The district court sustained Ms. Erickson's objections to the magistrate judge's finding that she was not likely to succeed on these claims. Specifically, the district court found that the actors' agreement, upon which the magistrate judge relied heavily, had expired before the videotapes in issue had been taped. Consequently, they were not covered by the agreement.

Trinity alleges two errors of law in the district court's analysis. First, Trinity maintains that the district court erred in failing to recognize collaboration as an alternate basis for establishing joint authorship.[3] Second, it argues that the district court applied the wrong legal standard in determining whether Ms. Erickson was likely to succeed on the merits. We address each of these arguments in turn.

## II

## ANALYSIS

### A. *Standard of Review*

"This Court gives substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors." *United States v. Baxter Healthcare Corp.,* 901 F.2d 1401, 1407 (7th Cir.1990). However, "the more purely legal conclusions made by a district court in granting a preliminary injunction are subject to de novo review." *Id.*

Generally four factors are relevant in determining whether to grant or deny a preliminary injunction. A district court typically considers whether the moving party has demonstrated (1) some likelihood of prevailing on · the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. *Abbott Lab. v. Mead Johnson & Co.,* 971 ·F.2d 6, 11 (7th Cir.1992); *Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984). If the movant clears these two thresholds, the court must consider (3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Abbott Lab.,* 971 F.2d at 12; *Lawson Prods.,* 782 F.2d at 1433; *Roland Mach.,* 749 F.2d at 387–88.

The central issue in this appeal is whether Ms. Erickson is likely to succeed on the merits of her case. Whether Ms. Erickson will succeed depends greatly on whether Trinity can establish that the works at issue were joint works within the meaning of the Copyright Act of 1976. Statutory interpretation is a question of law and therefore we review the district court's determination of this issue de novo. *See, e.g., United States v. Shriver,* 989 F.2d 898, 901 (7th Cir.1992) ("[T]he court of appeals must review the district court's interpretation of the applicable statute de novo.").

### B. *Joint Work*

We now turn to the issue of whether any of the material in question is a "joint

---

3. Trinity does not argue on appeal that the district court erred when it found that the videotapes were not covered by the actors' agreement. Trinity, instead, claims rights in the videotapes pursuant to the joint authorship of its actors in the plays. Consequently, we shall not address the question of the videotapes apart from our discussion of the plays.

work." In a joint work, the joint authors hold undivided interests in a work, despite any differences in each author's contribution. 17 U.S.C. § 201. Each author as co-owner has the right to use or to license the use of the work, subject to an accounting to the other co-owners for any profits. *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir.1991); *Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir.1987); 1 *Nimmer on Copyright*, § 6.02, at 6–7 to 6–8. Thus, even a person whose contribution is relatively minor, if accorded joint authorship status, enjoys a significant benefit. *See Community for Creative Non–Violence v. Reid*, 846 F.2d 1485, 1498 (D.C.Cir.1988), *aff'd on other grounds*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *Nimmer*, § 6.08, at 6–24.

■ In determining whether any of the works at issue in this case may be classified as a "joint work," our starting point must be the language of the statute. Section 101 of the Copyright Act defines a "joint work" as

a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

17 U.S.C. § 101.

### 1.

Neither the Act nor its legislative history defines "inseparable" or "interdependent." The legislative history states that examples of inseparable parts are the joint contributions of two authors to a single novel or the contributions of two painters to a single work; an example of interdependent parts are the lyrics and music for a song.[4] Apart from these examples, the reports do little to clarify the criteria for determining joint authorship. Indeed, they increase the ambiguity. The committee reports state:

[A] work is "joint" if the authors collaborated with each other, *or if each* of the authors prepared his or her contribution with the knowledge and *intention* that it would be merged with the contributions of other authors as "inseparable or interde-

pendent parts of a unitary whole." The touchstone here is *the intention, at the time the writing is done,* that the parts be absorbed or combined into an integrated unit. . . .

House Report at 120; Senate Report at 103, U.S.Code Cong. & Admin.News 1976, pp. 5736 (emphasis added). The statute clearly requires a focus on the intention to collaborate. However, the disjunctive first sentence in the legislative reports, set out directly above, seemingly contradicts that statutory language by focusing on collaboration and not mentioning intent to create a joint work.

■ This ambiguity presents analytical problems in cases such as this one, in which the parties have collaborated in some sense but dispute whether there was a mutual intent to create a joint work. In resolving this ambiguity, we believe that it is important to note, at the outset, that the statute itself requires that there be an intent to create a joint work. Therefore, reliance on collaboration alone, as Trinity suggests, would be incompatible with the clear statutory mandate. On this point, we find ourselves in agreement with the analysis of Judge Newman writing for the Second Circuit in *Childress*. He pointed out that a disjunctive standard based solely on the legislative history would not square with the plain meaning of the statute:

This passage appears to state two alternative criteria—one focusing on the act of collaboration and the other on the parties' intent. However, it is hard to imagine activity that would constitute meaningful "collaboration" unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole, and the case law has read the statutory language literally so that the intent requirement applies to all works of joint authorship.

*Childress*, 945 F.2d at 505–06. Like the Second Circuit in *Childress*, we believe that the statutory language clearly requires that each author intend that their respective con-

---

4. *See* House Report at 120, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736; S.Rep. No. 473, 94th Cong., 2d Sess. 103–04 (1975) ("Senate Report").

tributions be merged into a unitary whole. Focusing solely upon the fact of contemporaneous input by several parties does not satisfy the statutory requirement that the parties intend to merge their contributions into a unified work. In addition, the "collaboration alone" standard would frustrate the goal of the Act "[t]o promote the Progress of Science and the useful Arts." U.S. Const. art. I, § 8, cl. 8. Seldom would an author subject his work to pre-registration peer review if this were the applicable test. Those seeking copyrights would not seek further refinement that colleagues may offer if they risked losing their sole authorship. Thus, we cannot accept Trinity's proposed "collaboration alone" test as compatible with the language and purpose of the Act.

2.

 Even if two or more persons collaborate with the intent to create a unitary work, the product will be considered a "joint work" only if the collaborators can be considered "authors." Courts have applied two tests to evaluate the contributions of authors claiming joint authorship status: Professor Nimmer's de minimis test and Professor Goldstein's copyrightable subject matter ("copyrightability") test. The de minimis and copyrightability tests differ in one fundamental respect. The de minimis test requires that only the combined product of joint efforts must be copyrightable. By contrast, Professor Goldstein's copyrightability test requires that each author's contribution be copyrightable. We evaluate each of these tests in turn.

In undertaking this task, we focus on how well the test promotes the primary objective of the Act. This objective is not to reward an author for her labors, but "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8; see also Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 350, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991). This objective is accomplished by "assur[ing] authors the right to their original expression," but also by "encourag[ing] others to build freely upon the ideas and information conveyed by a work." Feist Publications, 499 U.S. at 349–50, 111 S.Ct. at 1290 (citing Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556–57, 105 S.Ct. 2218, 2228–29, 85 L.Ed.2d 588 (1984)). It is in light of this goal that § 102(b) exempts ideas from protection under the Copyright Act.[5]

In addition to promoting the Act's primary objective, we must consider how well the test will further goals of administrative and judicial efficiency.[6] In this inquiry, we must adopt a standard that is sufficiently clear to enable parties to predict whether their contributions to a work will receive copyright protection. A standard satisfying these aims will allow contributors to avoid post-contribution disputes concerning authorship, and to protect themselves by contract if it appears that they would not enjoy protections of the Act itself.

a. Professor Nimmer's de minimis standard

Professor Nimmer, the late scholar on copyright, took the position that all that should be required to achieve joint author

**5.** Section 102(b) provides:

In no case does copyright protection for an original work of authorship extend to any idea, procedure, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b). The Supreme Court explained this exemption succinctly, stating: " 'The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book.' " Feist Publications, 499 U.S. at 350, 111 S.Ct. at 1290 (quoting Baker v. Selden, 101 U.S. 99, 103, 25 L.Ed. 841 (1880)); see also

Harper & Row, 471 U.S. at 547–48, 105 S.Ct. at 2223–24 (discussing idea/expression or fact/expression dichotomy).

**6.** Concerns of judicial economy often enter the analysis of whether to adopt or maintain a given rule or test. See, e.g., Ankenbrandt v. Richards, —— U.S. ——, ——, 112 S.Ct. 2206, 2215, 119 L.Ed.2d 468 (1992) (stating that concerns of judicial economy weighed in favor of excluding family law questions from diversity jurisdiction); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (weighing interests of predictability and judicial economy in adopting federal statute of limitations).

status is more than a de minimis contribution by each author. "De minimis" requires that "more than a word or line must be added by one who claims to be a joint author." *Nimmer* § 6.07, at 6–21. Professor Nimmer distinguishes his de minimis standard from the standard for copyrightability. *Id.* As an example, Professor Nimmer asserts that if two authors collaborate, with one contributing only uncopyrightable plot ideas and another incorporating those ideas into a completed literary expression, the two authors should be regarded as joint authors of the resulting work. *Id.*

This position has not found support in the courts.[7] The lack of support in all likelihood stems from one of several weaknesses in Professor Nimmer's approach. First, Professor Nimmer's test is not consistent with one of the Act's premises: ideas and concepts standing alone should not receive protection. Because the creative process necessarily involves the development of existing concepts into new forms, any restriction on the free exchange of ideas stifles creativity to some extent. Restrictions on an author's use of existing ideas in a work, such as the threat that accepting suggestions from another party might jeopardize the author's sole entitlement to a copyright, would hinder creativity. Second, contribution of an idea is an exceedingly ambiguous concept. Professor Nimmer provides little guidance to courts or parties regarding when a contribution rises to the level of joint authorship except to state that the contribution must be "more than a word or a line." *Nimmer,* § 6.07, at 6–20.

Professor Nimmer's approach is of little pragmatic use in resolving actual cases.

Rarely will minor contributors have the presumption to claim authorship status. In such easy cases, the parties' intent as to authorship status likely will be apparent without resort to any formal test evaluating the parties' respective contributions to discern intent. In the more complex situations, such as the case before us, in which the improvisational process undoubtedly yielded valuable insights to the primary author, the test gives no guidance on how we are to assess the respective contributions of the parties to distinguish the author from the critic or advisor. For these reasons, we, as the majority of the other courts, cannot accept Professor Nimmer's test as an adequate judicial tool to ascertain joint authorship.

### b. Professor Goldstein's copyrightability test

The copyrightable subject matter test was formulated by Professor Paul Goldstein and has been adopted, in some form, by a majority of courts that have considered the issue.[8] According to Professor Goldstein, "[a] collaborative contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright." Paul Goldstein, *Copyright: Principles, Law, and Practice* § 4.2.1.2, at 379 (1989). Furthermore, the parties must have intended to be joint authors at the time the work was created. *Id.* Professor Goldstein and the courts adopting his test justify this position by noting that § 101's and § 302(b)'s use of the word "authors"[9] suggests that each collaborator's contribution

7. The only judicial comment of note appears in a case from the District of Columbia Circuit and that mention is at best neutral dicta. *See Community for Creative Non–Violence,* 846 F.2d at 1496 n. 15 (stating that "[i]f Nimmer is correct on the point that the contribution of a joint author need not be copyrightable" CCNV's contributions may satisfy the de minimis test).

8. *See Childress,* 945 F.2d at 507; *Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 521 (9th Cir.1990); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 609 F.Supp. 1307, 1318–19 (E.D.Pa.1985), *aff'd,* 797 F.2d 1222 (3d Cir.1986), *cert. denied,* 479 U.S.

1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Kenbrooke Fabrics, Inc. v. Material Things,* 223 U.S.P.Q. 1039, 1044–45, 1984 WL 532 (S.D.N.Y. 1984); *Meltzer v. Zoller,* 520 F.Supp. 847, 857 (D.N.J.1981); *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co.,* 542 F.Supp. 252, 259 (D.Neb.1982).

9. Section 101 states: "A 'joint work' is a work prepared by two or more *authors....*" 17 U.S.C. § 101 (emphasis added). Section 302(b), which governs the duration of a copyright, begins as follows: "In the case of a joint work prepared by two or more *authors....*" 17 U.S.C. § 302(b) (emphasis added).

must be a copyrightable "work of authorship" within the meaning of § 102(a).

■ We agree that the language of the Act supports the adoption of a copyrightability requirement. Section 101 of the Act defines a "joint work" as a "work prepared by two or more *authors*" (emphasis added). To qualify as an author, one must supply more than mere direction or ideas. An author is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989). As to the requirement of fixation, § 101 states:

> A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

17 U.S.C. § 101.

The copyrightable subject matter test does not suffer from the same infirmities as Professor Nimmer's de minimis test. The copyrightability test advances creativity in science and art by allowing for the unhindered exchange of ideas, and protects authorship rights in a consistent and predictable manner. It excludes contributions such as ideas which are not protected under the Copyright Act. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea ... embodied in such work."); *see also Feist Publications v. Rural Tel. Serv. Co.,* 499 U.S. 340, 344–45, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991) (stating that the "most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates' "); *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985) (discussing idea/expression dichotomy). This test also enables parties to predict whether their contributions to a work will entitle them to copyright protection as a joint author. Compared to the uncertain exercise of divining whether a contribution is more than de min-

imis, reliance on the copyrightability of an author's proposed contribution yields relatively certain answers. *See* 17 U.S.C. § 101; *Feist Publications,* 499 U.S. at 344–50, 111 S.Ct. at 1287–90. The copyrightability standard allows contributors to avoid post-contribution disputes concerning authorship, and to protect themselves by contract if it appears that they would not enjoy the benefits accorded to authors of joint works under the Act.

■ We agree with the *Childress* court's observation that the copyrightability test "strikes an appropriate balance in the domains of both copyright and contract law." 945 F.2d at 507. Section 201(b) of the Act allows any person to contract with another to create a work and endow the employer with authorship status under the Act. 17 U.S.C. § 201(b). A contributor of uncopyrightable ideas may also protect her rights to compensation under the Act by contract. Section 201(d) of the Act provides in part that any of the exclusive ownership rights comprised in a copyright may be transferred from the person who satisfied the requirements for obtaining the copyright to one who contracts for such rights. 17 U.S.C. § 201(d). Thus, anyone who contributes to the creation of a work, either as patron, employer, or contributor of ideas, has the opportunity to share in the profits produced by the work through an appropriate contractual arrangement.

C. *Application*

We now address Trinity's claims of joint authorship under the copyrightability test. As stated above, Trinity must clear two hurdles in order to establish that the plays at issue are joint works. First, it must show the parties intended to be joint authors at the time the work was created. Second, Trinity must show that its contributions to the works were independently copyrightable.

■ It is clear that, with regard to at least two works, *Much Ado* and *Prairie Voices,* Trinity cannot clear the first hurdle. *Much Ado* is based on a work that Ms. Erickson had largely completed before Trinity actors improvised based on Ms. Erickson's creation. The fact that one actor, Michael

Osborne, suggested that Ms. Erickson include a passage from *Macbeth* and an introduction to the play does not make him a joint author. He conceded that whether his contributions were included and where they went into the compilation were entirely Ms. Erickson's decisions. Furthermore, neither Ms. Erickson nor Trinity considered any of the actors to be co-authors with her in *Much Ado*, as is evidenced by the licensing agreement. Similarly with *Prairie Voices*, Ms. Erickson provided the stories on which the play was based, and she decided which of the actors' suggestions were incorporated into the script. The actors did not consider themselves to be joint authors with Ms. Erickson, and there is no evidence that Ms. Erickson considered the actors as co-authors of the script. Because Trinity cannot establish the requisite intent for *Much Ado* or *Prairie Voices*, the actors cannot be considered joint authors for the purposes of copyright protection.[10]

▇▇▇ *Time Machine*, as both the magistrate judge and the district court noted, is more problematic. Paddy Lynn testified that at least two scenes from *Time Machine* were developed through a collaborative process. Ms. Lynn considered the created dialogue to be hers as well as Ms. Erickson's.

Furthermore, there is evidence that Ms. Erickson, too, intended at the time to create a joint work because she initially attributed the script to both Ms. Lynn and herself. Consequently, Trinity has produced some evidence that there was the requisite intent for joint authorship with regard to *Time Machine*. In *Childress*, the Second Circuit specifically acknowledged that " 'billing' or 'credit' " may be evidence of intent to create a joint work. *Id.* at 508. Here there is evidence that Ms. Lynn was credited with authorship of *Time Machine*.

▇▇▇ In order for the plays to be joint works under the Act, Trinity also must show that actors' contributions to Ms. Erickson's work could have been independently copyrighted. Trinity cannot establish this requirement for any of the above works. The actors, on the whole, could not identify specific contributions that they had made to Ms. Erickson's works. Even when Michael Osborne was able to do so, the contributions that he identified were not independently copyrightable. Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights. Consequently, Trinity cannot establish the two necessary elements of the copyrightability test and its claims must fail.

10. We find the analysis in *Childress v. Taylor*, 945 F.2d 500 (2d Cir.1991), helpful. In *Childress*, the defendant Clarice Taylor, a renowned "Moms" Mabley imitator, contacted the plaintiff Alice Childress, a playwright, and enlisted her to write a play based on "Moms" Mabley's life. Taylor provided Childress with universal extensive research materials on Mabley and later performed more in-depth research at Childress's request. In addition to providing research material, Taylor specifically suggested that certain scenes and characters should appear in the play. Furthermore, some of the jokes in the play were the product of Taylor's research. Taylor also discussed the progress of the written script with Childress on a regular basis. The Second Circuit summarized the parties' respective contributions as follows: "Essentially, Taylor contributed facts and details about 'Moms' Mabley's life and discussed some of them with Childress. However, Childress was responsible for the actual structure of the play and the dialogue." *Id.* at 502. The Second Circuit affirmed a grant of summary judgment in favor of Childress. The Second Circuit did not reach the question of copyrightability because it found that the requisite intent to be joint authors did not exist. The court stated:

Childress was asked to write a play about "Moms" Mabley and did so. To facilitate her writing task, she accepted the assistance that Taylor provided, which consisted largely of furnishing the results of research concerning the life of "Moms" Mabley. As the actress expected to portray the leading role, Taylor also made some incidental suggestions, contributing ideas about the presentation of the play's subject and possibly some minor bits of expression. But there is no evidence that these aspects of Taylor's role ever evolved into more than the helpful advice that might come from the cast, the directors, or the producers of any play. A playwright does not so easily acquire a co-author.

*Id.* at 509.

The circumstances in *Childress* and the circumstances surrounding the development of *Much Ado* and *Prairie Voices* are very similar. Here, the actors provided suggestions and contributed ideas; their contributions merely arose from a different process than in *Childress*. Indeed, Taylor presented a somewhat stronger case. She was able to identify specific material attributable to her. Trinity actors, with one exception, were unable to identify specific contributions they had made.

Trinity cannot establish joint authorship to the plays at issue. As a result, Trinity cannot overcome the presumption in favor of the validity of Ms. Erickson's copyrights. Consequently, Ms. Erickson is very likely to succeed on the merits of her claims for copyright infringement.[11]

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

11. Because her likelihood of success is so high, we need not address Trinity's arguments that the district court erred in applying a "less than negligible" standard to this element of a preliminary injunction analysis. We also believe it unnecessary to reweigh the competing harms and interests involved in issuing a preliminary injunction. As both the magistrate judge and the district court noted, public policy strongly favors the protections of copyrights. Given this fact, we cannot say that the district court abused its discretion in favoring copyright protection.