Philip AHN, Elizabeth Malecki, and Katalin Zamiar, Plaintiffs,

v.

MIDWAY MANUFACTURING COMPANY, Williams Electronics Games, Inc., Nintendo of America, Inc., Sega of America, Inc., Acclaim Entertainment, Inc., Defendants.

No. 95 C 0719.

United States District Court, N.D. Illinois, Eastern Division.

May 28, 1997.

Nancy Jo Doyle, Hugh J. McCarthy, Hugh J. McCarthy & Associates, Ltd., Chicago, IL, Joel Miles Carlins, Carlins & Moss, Chicago, IL, for plaintiffs.

Gerald Owen Sweeney, Jr., John Thomas Williams, Robert A. Knuti, Lord, Bissell & Brook, Chicago, IL, for Midway Mfg. Co., Williams Electronic Games, Inc.

Steven P. Mandell, Richard Eric Gottlieb, James C. Daulton, Davidson, Goldstein, Mandell & Menkes, Chicago, IL, for Nintendo of America, Inc., Sega of America.

Joseph A. Yanny, Fischbach, Perlstein & Yanny, Los Angeles, CA, Steven P. Mandell, Richard Eric Gottlieb, James C. Daulton, Davidson, Goldstein, Mandell & Menkes, Chicago, IL, for Acclaim Entertainment, Inc.

### *MEMORANDUM OPINION AND ORDER*

GETTLEMAN, District Judge.

Plaintiffs Philip Ahn, Elizabeth Malecki, and Katalin Zamiar bring this seven count action against defendants Midway Corporation ("Midway"), Williams Electronics Games, Inc. ("Williams"), Acclaim Entertainment, Inc. ("Acclaim"), Nintendo of America, Inc. ("Nintendo"), and Sega of America, Inc. ("Sega"), alleging infringement of the common law right of publicity, and violations of: Section 43(a) of the Lanham Act; the Illinois Consumer Fraud and Deceptive Practices Act; the Illinois Uniform Deceptive Trade Practices Act; and, the Copyright

**1136**

Act of 1976, along with one count under common law quantum meruit. Plaintiffs seek a constructive trust on all moneys defendants received and continue to receive from the alleged breach of their duty to plaintiffs. Defendants have filed a motion for summary judgment on all counts. For the reasons set forth below, defendants' motion is granted.

### FACTS

Plaintiff Philip Ahn is a fourth degree black belt in Tae Kwon Do and has practiced martial arts for approximately twenty years. Plaintiff Elizabeth Malecki holds a degree in ballet and modern dance and is a professional dancer, actress, and aerobics instructor. Plaintiff Katalin Zamiar is a first degree black belt in Karate and has twelve years of experience. Midway designs, manufactures, and sells coin-operated amusement games and licenses home video games, including Mortal Kombat and Mortal Kombat II, to which Midway owns the copyright to the computer program and related audiovisual materials. Williams acts in conjunction with Midway in designing, manufacturing, and selling coin-operated video games. Acclaim manufactures software for use in Nintendo and Sega hardware systems for home video games. Nintendo and Sega design, market and sell home video games.

Plaintiffs' versions of the events that lead to their association with Midway are essentially identical. All plaintiffs allege that on separate occasions between 1992 and 1993 they were approached by Midway's agents about the possibility of using their images, names and performances for various character in the coin-operated arcade format of Mortal Kombat and Mortal Kombat II. Plaintiff Malecki modeled the character Sonja Blade for Mortal Kombat. Plaintiff Ahn modeled the character Shang Tsung in the coin-operated version of Mortal Kombat II, while plaintiff Zamiar modeled for three characters, Kitana, Mileena, and Jade, all of whom appeared in Mortal Kombat II. Plaintiffs' movements were videotaped by Midway and these images were eventually digitalized and incorporated into the coin-operated arcade games.

All plaintiffs signed a release form with Midway at the time of the videotaping. This agreement authorized Midway to film each plaintiff in a martial arts performance in order to use that plaintiff's name or likeness in connection with the manufacture, design, advertising, promotion, sale, and use of the coin-operated video games. The agreement also made Midway the sole and exclusive owner of all of plaintiffs' copyrightable expression, defining any such expression as "works for hire," and permitted Midway, at its sole discretion, to use plaintiffs' likeness in any copyright obtained in connection with the coin-operated arcade games.

Plaintiffs allege that they were required to sign the release in case of injury and that Midway lead them to believe that only a small number of arcade games were being contemplated. However, in the event the game proved successful, they were told they would receive bonuses, or if the coin-operated versions of the game developed into ancillary uses, plaintiffs would receive royalties, and would be considered for movie parts, personal appearances and television commercials. Plaintiffs allege that based on these representations they all signed the agreement, which the parties refer to as the General Release.

The arcade version of Mortal Kombat and its successor, Mortal Kombat II, proved to be successful. In September, 1993, Acclaim, Nintendo and Sega released the home video game version of Mortal Kombat, and in September, 1994, they released the home game version of Mortal Kombat II. In April of 1994, all plaintiffs attended a meeting with agents of Midway and Williams. At this meeting plaintiffs were promised what plaintiffs have termed "wonderful opportunities" if they signed an additional agreement, known as the Non-disclosure Agreement and Release. Plaintiffs allege that at this meeting they were informed that various companies were interested in utilizing plaintiffs' images in various products and commercial endorsements. All three plaintiffs refused to sign this second agreement.

Plaintiffs' seven count complaint against defendants is based on the alleged unauthorized use of their names, persona and like-

nesses in connection with the home video, home computer, and hand-held versions of Mortal Kombat and Mortal Kombat II. Plaintiffs' response to defendants' motion for summary judgment indicates that they do not contest defendants' motion on the counts dealing with the Lanham Act (Count II), the Illinois Consumer Fraud and Deceptive Practices Act (Count III) and the Illinois Uniform Deceptive Trade Practices Act (Count IV). Accordingly, the only counts remaining are Count I alleging infringement of the right of publicity, Count V alleging violation of the Copyright Act of 1976, and Count VII, the common law quantum meruit count.

### DISCUSSION

#### I.  Summary Judgment Procedure

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant, and any doubts as to whether a genuine factual dispute exists must be resolved in favor of the non-moving party. *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1477 (7th Cir.1990). However, once the movant has satisfied its initial burden, the nonmoving party then has the burden of coming forward with evidence demonstrating that there is a genuine issue to be tried to the factfinder. *Id.* A fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II.  The Right of Publicity

In Count I plaintiffs allege that defendants' unauthorized use of their names, personas, and likenesses violated their common law right of publicity. Defendants argue both that the right of publicity is preempted by the Copyright Act of 1976, 17 U.S.C. § 301(a), and that plaintiffs have not satisfied the requirements for a claim under the right of publicity.[1]

A state claim is preempted by the Copyright Act if two elements are satisfied. First, the work in which the right is asserted must be fixed in a tangible form and fall within the subject matter of copyright under § 102 of the Act. Second, the right asserted must be equivalent to any of the rights specified in § 106 of the Act. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 674 (7th Cir.1986). Section 102 sets forth three conditions for copyrightability. First, the work must be fixed in a tangible form; second, the work must be the original work of authorship; and third, the work must come within the subject matter of copyright. *Baltimore Orioles*, 805 F.2d at 668. Under § 106, the copyright owner has certain rights including reproduction, the preparation of derivative works, and distribution. A state claim is equivalent to one of the rights asserted under the Copyright Act if it is violated by the exercise of any of the rights set forth in § 106. *Baltimore Orioles*, 805 F.2d at 676. In *Baltimore Orioles*, the Major League Baseball Players Association asserted that the telecasts of Major League Baseball games were made without the players' consent, and that the telecasts misappropriated the players' property right in their performances. The plaintiffs, representing the Major League baseball clubs, brought an action seeking declaratory judgment that the clubs possessed the exclusive right to broadcast the games and the exclusive right to the telecasts. *Id.* at 665.

Applying the two-part test, the Seventh Circuit held that the baseball clubs' copyright

---

1. Because the court concludes that plaintiff's publicity claim is preempted, it need not reach defendant's assertion that they are entitled to judgment on the claim because plaintiffs cannot demonstrate that they had acquired any value in their names or likenesses. The court notes, however, that an issue of fact exists as to whether plaintiffs had acquired such value through defendants' promotion of the arcade games, prior to the alleged misappropriation.

in the telecasts preempted the players' right of publicity in their game time performances. The court held that the first condition for preemption, fixation in a tangible form, was satisfied because the telecasts of the baseball games were recorded simultaneously. *Id.* at 674. The court then examined whether the right of publicity was equivalent to one of the rights specified in § 106 of the Copyright Act. The court held that because the right to broadcast telecasts of the games infringes on the players' right of publicity in their performance, and because the right of publicity does not differ in kind from copyright, the players' right was equivalent to one of the rights encompassed in § 106 of the Copyright Act. Accordingly, because both elements of preemption were satisfied, the players' state claim under the right of publicity was preempted. *Id.* at 677.

■ In the instant case, plaintiffs' images were videotaped and, as a result, became fixed in a tangible form. To be fixed in a tangible form, the work must be recorded by or under the authority of the author. 17 U.S.C. § 101 (1994). Because plaintiffs' consented to the videotaping, the definition of 'fixed' is satisfied. Further, the choreographic works were all original works of authorship. Finally, choreographic works fall within the subject matter of copyright. *See,* Nimmer on Copyright, § 2.07(B). Thus, the first condition for preemption has been satisfied.[2] Applying the § 106 test, the right of publicity is equivalent to one of the rights in § 106 because it is infringed by the act of distributing, performing or preparing derivative works. Thus, plaintiffs' claim is preempted.

### III. Copyright Act of 1976

In Count V of their complaint, plaintiffs allege that defendants, in filing and securing an exclusive copyright to the exclusion of plaintiffs, unlawfully appropriated plaintiffs' choreographic work. Plaintiffs further allege that defendants violated the copyright laws when they reproduced plaintiffs' protected expression, and ask this court to grant a permanent injunction pursuant to §§ 502–506 of the Copyright Act prohibiting all defendants from using plaintiffs' choreographic works, personas, names and/or likenesses. In the alternative, plaintiffs ask that this court find that the software for Mortal Kombat and Mortal Kombat II are joint works, as evidenced by their limited release.

■ Defendants correctly argue that Midway's certificates of registration from the Copyright Office constitute prima facie evidence of the validity of their copyright, and upon introduction of the certificates the burden shifts to the party challenging the invalidity of the copyright to overcome this presumption and affirmatively demonstrate invalidity. *Fonar Corp. v. Domenick,* 105 F.3d 99, 101 (2nd Cir.1997). Defendants argue that because plaintiffs have failed to rebut this presumption, they are entitled to summary judgment. In addition, defendants argue that because defendants Midway and Williams alone developed the source code for the games—and it was that source code that was copyrighted—those defendants must, as a matter of law, be considered the sole authors of the work.

■ Under federal copyright law, if a work is considered "joint" the joint authors hold undivided interests in the work. 17 U.S.C. § 201 (1994). Each author, as a co-owner, has the right to use or to license the use of the work, subject to an accounting to the other co-owners for any profits. *See Napoli v. Sears, Roebuck & Co.,* 874 F.Supp. 206, 209 (N.D.Ill.1995).[3] Thus, this court must determine whether plaintiffs and defendant Midway are to be considered joint authors in the computer program that incorporates plaintiffs' performances.

---

2. Even if plaintiffs argue that it is their performance in which they claim a right and not the videotape of the performance, the plaintiffs' claim must still fail. In *Baltimore Orioles,* plaintiffs' claimed a right in their performances, and not in the telecast. *Baltimore Orioles,* 805 F.2d at 674. The court, however, held that because the performances were embodied in a copy, the performances were fixed in a tangible form and thus satisfied the definition of 'fixed' under 17 U.S.C. § 101. *Id.* at 675.

3. In *Napoli,* this court had occasion to review the law governing joint authorship of computer programs and graphics. Although that opinion was later withdrawn for other reasons, 926 F.Supp. 780 (N.D.Ill.1996), the analysis discussed therein is a useful reference for purposes of the instant case.

■ A joint work is defined as "a work prepared by two or more authors with the intention that their contribution be merged into inseparable or interdependent parts of the unitary whole." 17 U.S.C. § 101 (1994). In *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061 (7th Cir.1994), a playwright successfully sought to enjoin a theater whose actors had contributed ideas to the plaintiff's copyrighted plays and videotapes from performing these plays without license from the plaintiff. The Seventh Circuit adopted Professor Goldstein's copyrightable subject matter test to determine the issue of joint authorship. Under this standard, "[a] collaborative contribution will not produce a joint work, and a contribution will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright." *Id.* at 1070.

■ In addition, the Goldstein test requires that the parties must have intended to be joint authors at the time the work was created. The intent requirement is satisfied if the parties intended to merge their respective contributions into a single whole. The mere fact, however, of contemporaneous input into the copyrighted work does not satisfy the statutory requirement of intent. "To qualify as an author, one must supply more than mere direction or ideas. An author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright expression." *Erickson,* 13 F.3d at 1071. As to the requirement of fixation, § 101 states: "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.*

In *Erickson,* the Seventh Circuit held there was no intent between the playwright and the theater to be joint authors at the time the plays were written. The court relied on certain factors to determine the absence of joint authorship. First, the works were largely created before the actors offered their improvisations. Second, final contents of the plays, including which suggestions to be incorporated, were solely determined by the playwright. Third, neither the playwright nor the theater considered the actors to be joint authors. Based on these factors the court in *Erickson* ruled that the defendants could not overcome the presumption in favor of the plaintiff's copyright.

■ In the present case plaintiffs incorrectly assert that they are co-authors of the copyrighted work. First, plaintiffs offer no evidence to rebut Midway's affidavit that it never considered plaintiffs to be collaborators or joint authors of the games. More importantly (since plaintiffs correctly point out that it is difficult to come up with hard evidence to rebut a self-serving statement of intent) [4], Midway's agents had the final authority to decide on the selection of movements and poses that would be recorded during the videotaping session as well as the authority to decide which frames of the videotape and in what manner and order the frames would be incorporated into the computer program that drives the game.

Indeed, Midway alone decided which portions of plaintiffs' "performances" to digitalize and alone transformed the video images into the cartoon-like images in the game. It is apparent to the court, in viewing videotapes of the actual games, that the superhuman gyrations and leaps high into the air of the characters, including plaintiffs' characters, are fanciful products of the imaginations of the creators of the source codes—much like the playwright's penmanship in *Erickson.* To be sure, according to their testimony, plaintiffs contributed their images and movements to the creation of the games, but,

---

**4.** Midway, however, has presented some hard evidence of its intent that plaintiffs not be considered joint authors. The Release Agreement specifically identified each plaintiff's contributions as a "work for hire." This document, prepared and signed contemporaneously with plaintiffs' performances, clearly indicates defendants' intent that plaintiffs not be considered joint authors. *Erickson,* 13 F.3d at 1072. In their complaint plaintiffs suggest that they were "induced" into signing the general releases. Plaintiffs have failed, however, to plead a separate claim for fraudulent inducement, and their attorney candidly admitted at oral argument that they could not prove such a claim.

like the actors in *Erickson*, that contribution was transitory. It was Midway alone that translated the ideas "into a fixed, tangible expression entitled to copyright protection." *Erickson*, 13 F.3d at 1071.

Finally, the general release signed by all plaintiffs made Midway the sole and exclusive owner of all plaintiffs' copyrightable expression in connection with the coin-operated arcade games and stipulated that plaintiffs' efforts were "works for hire." Plaintiffs have conceded that this agreement partially governed their relationship with respect to the production of the arcade games. It is also uncontested that the source codes (that are the subject of Midway's copyright) for the arcade games are the same source codes used in the hand-held and home video versions. It is hard to see how plaintiffs could have conveyed any and all their rights with respect to the original source codes, yet retain additional rights when that same code is used in another application.

Accordingly, this court concludes that the uncontested facts demonstrate that plaintiffs cannot prove that they are joint authors of the copyrighted source codes. Summary judgment will therefore be entered for defendants on Count V.

### IV. Quantum Meruit

In Count VII of their complaint plaintiffs request the reasonable value of their services and royalties under the common law theory of quantum meruit. Quantum meruit "is based on the premise that a party should not be permitted to retain the benefit of services provided by another if such retention 'violates the fundamental principles of justice, equity, and good conscience.'" *Industrial Specialty Chemicals v. Cummins Engine Co.*, 918 F.Supp. 1173, 1179 (N.D.Ill.1996). To be successful on a claim under quantum meruit, a party must prove performance of the services, reasonable value of the services, and a benefit received by the defendant without paying the complaining party. *Id.* Under Illinois law, however, the law which governs this dispute,

a plaintiff cannot pursue a quasi-contractual claim where there has been an enforceable express contract between the parties. *Barry Mogul & Assocs. v. Terrestris Development Co.*, 267 Ill.App.3d 742, 205 Ill.Dec. 294, 300, 643 N.E.2d 245, 251 (1994).

In the instant case, plaintiffs' claim under quantum meruit must fail because a valid, enforceable agreement existed between the parties. Contemporaneously with the videotaping of their performances, all plaintiffs signed the General Release. Under the terms of that document, plaintiffs received valuable consideration in exchange for, among other things, allowing defendants to videotape their performances and incorporate those performances into the arcade games. Thus, defendants are entitled to summary judgment on Count VII.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on all counts is granted.