**FOAMATION, INC., Plaintiff and Counterclaim Defendant,**

**v.**

**WEDEWARD ENTERPRISES, INC., Thomas and Rose Wedeward, Reiss Industries, Inc., and Thomas J. Reiss, Jr., Defendants.**

**SCOFIELD SOUVENIR & POST CARD COMPANY, Defendant and Counterclaimant,**

**v.**

**AD CETERA SPORTS MARKETING, INC., Counterclaim Defendant.**

No. 96–C–1047.

United States District Court, E.D. Wisconsin.

Dec. 2, 1996.

Gary A. Essmann, Andrus, Sceales, Starke & Sawall, Milwaukee, Arthur J. Hansmann, Hansmann Law Office, Racine, for plaintiff and counterclaim defendant.

John P. Fredrickson, Michael J. Gratz, Nilles & Nilles, Peter J. Stone, Paul Bargren, Ralph H. Lane, Foley & Lardner, Milwaukee, for defendant and counterclaimant.

## DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

The annals of Wisconsin sports history are filled with hundreds of names. They include

those names of players, coaches and team owners that are universally recognized. Perhaps among the more famous of these are Hank Aaron, Warren Spahn, Vince Lombardi, Curly Lambeau, Bart Starr, Kareem Abdul Jabbar, Robin Yount, Paul Hornung, Al McGuire, Bonnie Blair, Dan Jansen, Paul Molitor, and Oscar Robertson. Of course, there is a litany of others who, although they may not have yet attained the stature of those above named, have nevertheless made a valuable contribution to the tradition and spirit of sports history in the Badger State, (also known as "America's Dairyland"). The likes of Johnny Logan, Lew Burdette, George "the Boomer" Scott, Tommy Harper, George Bamberger, Cecil Cooper, Ted Simmons, Chester Marcol, Travis Williams, Don Nelson, Larry Costello, Alan "The Horse" Ameche, Suzy Favor–Hamilton, Eric and Beth Heiden, Jim Grabowski, Sydney Moncrief, Dean "The Dream" Meminger, Henry Jordan, Jim Fitzgerald, Herb Kohl, and Bud Selig, readily come to mind. Then there are the more obscure names. A short list might include Don Horn, Kenny Stills, Rich Campbell, Andy Pafko, Pedro Garcia, Mark Brouhard, Kurt Bevacqua, Danny Walton, Greg Dandridge, Randy Breuer, and Steve Underwood, just to name a few.

Perhaps someday the name of Amerik Wojciechowski[1] will find its way on to one of these lists.

## Background

On September 12, 1996, the plaintiff, Foamation, Inc., ("Foamation"), filed this action for copyright infringement, federal unfair competition, and Wisconsin state and common law trademark infringement. Its claims arise out of its allegedly having a copyright interest, among other things, in a "novelty hat," consisting "of a wearable sculpture in the form of a cheese wedge molded from polyurethene foam." (Complaint, ¶10). According to Foamation's complaint, the defendants, Wedeward Enterprises, Inc., Scofield Souvenir & Post Card Company, Thomas Wedeward, Rose Wedeward, Reiss Industries, Inc., and Thomas J. Reiss, Jr., (collec-

tively referred to hereinafter as "Scofield"), have designed and marketed their own novelty hat, which infringes upon Foamation's copyright interest in its novelty hat. Foamation calls its cheese wedge hat a "Cheesehead." Scofield calls its cheese wedge hat a "Cheese Top."

Scofield responded to the complaint by filing an answer, denying any infringement or other wrongdoing, and asserting a counterclaim alleging, among other things, that Foamation does not have a valid copyright to the cheese wedge hat. Because it does not, Foamation's contacting Scofield's customers and telling them that Scofield's hat infringes Foamation's copyright in an effort to discourage such customers from purchasing the "Cheese Top" constitutes, *inter alia*, unfair competition under 15 U.S.C. § 1125(a) [Section 43(a) of the Lanham Act] and the common law of Wisconsin, for which Scofield seeks compensatory and punitive damages.

On October 15, 1996, Scofield filed a motion for preliminary injunction seeking an order from this court prohibiting Foamation and Ad Cetera Sports Marketing, Inc. ("Ad Cetera")[2] from interfering with Scofield's current or prospective customers by asserting that Scofield is infringing Foamation's copyright or by making any other false, misleading or disparaging statements regarding Scofield. In support of its motion, Scofield filed a memorandum, together with declarations signed by Thomas Wedeward, Attorney John P. Fredrickson and Mary LaDuke Nickel.

On October 21, 1996, a conference call was conducted with counsel for the parties. As a result, a hearing on Scofield's motion for preliminary injunction was scheduled for November 21, 1996. Prior to that date, the parties conducted limited discovery, including depositions and exchange of documents. On November 5, 1996, Foamation filed its memorandum in opposition to Scofield's motion for preliminary injunction. Scofield filed its reply memorandum on November 18, 1996.

On November 21, 1996, a hearing was conducted on Scofield's motion for preliminary

---

1. According to Mr. Wojciechowski, an aid in pronouncing his name is the phrase, "Where's your house key?"

2. Ad Cetera provides marketing public relations services for Foamation.

injunction. Testifying at that hearing were Scott Papke, Amerik Wojciechowski, Mary Beth LaDuke Nickel, Mary Lee Deutsch (by deposition), Thomas Wedeward, and Ralph Bruno.

The court has jurisdiction of this action, pursuant to 17 U.S.C. §§ 501, *et. seq.*; 28 U.S.C. §§ 1331, 1338 and 1367. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400. The parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Rule 73(b), Fed.R.Civ.P.

For the reasons which follow, Scofield's motion for preliminary injunction is **GRANTED**.

### Facts

As stated, there were a number of witnesses who testified at the hearing on November 21, 1996. Their testimony and the exhibits which were introduced during that hearing demonstrate the following.

The Milwaukee Brewers started their 1987 season by winning 13 straight games. Their 13th win was against the Chicago White Sox, in Chicago, on April 20, 1987, (opening day having been April 6, 1987). Amerik Wojciechowski, a Milwaukee area resident and avid Brewer fan, had attended the April 20, 1987, game in Chicago, and noticed that some White Sox fans were ridiculing the Brewers' fans by calling them "cheeseheads."

Rather than being ashamed of being dubbed a "cheesehead," Mr. Wojciechowski decided to construct a cheese wedge-shaped hat out of cardboard when he returned home. He returned to Chicago to attend the April 21, 1987, game at old Comisky Park, where he proudly and prominently wore his cardboard cheese wedge hat. Unfortunately, the Brewers lost, and their winning streak was over. However, the next day a picture of Mr. Wojciechowski wearing his "cheese head" appeared on the front page of the sports section of the **Chicago Sun Times**.

That following weekend, i.e., on Saturday, April 25, 1987, Mr. Wojciechowski attended the Brewers–Baltimore Oriole game in Milwaukee. By that time, he had constructed a second cardboard cheese wedge hat for his son. Both wore their hats during the game. The game was carried on national television and Mr. Wojciechowski and his son were seen by the nation wearing their cheese wedge hats. The following day a photograph of them standing behind the Milwaukee Brewers' dug-out, prominently wearing their cheese wedge hats, appeared in the **Milwaukee Journal**. (A copy of that photograph is appended to this Decision and Order.)

Seeing that his cardboard cheese wedge hats had struck a chord of popularity, Mr. Wojciekowski looked into having cheese wedge hats made out of foam. His efforts proved successful. By the end of April 1987, or early May 1987, Mr. Wojciekowski had had approximately 20 foam cheese wedge hat prototypes made. In all, he had approximately 2500 to 3000 foam cheese wedge hats manufactured. He marketed them himself, selling them through "Merle Harmon's Fan Fare" shop and the public radio program, "What Do You Know?"

The foam that was used to make Mr. Wojciekowski's cheese wedge hats was cut at "Adam's Foam" in Chicago, Illinois. The hats were then silkscreened at "Print Works" in the Milwaukee area.[3] After the silkscreening was completed, Mr. Wojciekowski would pick-up the cheese wedge hats and take them to his house, where he would store them in his garage. Some were also picked-up by representatives of "Merle Harmon's Fan Fare." As of the date of the preliminary injunction hearing, Mr. Wojciekowski did not have any more of his foam cheese wedge hats in his possession. Nor, much to his chagrin, did he retain the two original cardboard cheese wedge hats that he had made for his son and himself.

Scott Papke testified during the hearing of November 21, 1996. Mr. Papke was Mr. Ralph Bruno's partner up until June 2, 1989, when their partnership, known as "S & R", was dissolved. They had operated as partners in the storage business. They had also operated as partners in making patterns for the foundry and plastics industries.

According to Mr. Papke, sometime shortly prior to May 13, 1987, Ralph Bruno ap-

---

**3.** The hats were silkscreened to display "holes" in the cheese wedge. Additionally, Mr. Wojciechowski had three phrases silkscreened on to the hats: "Curd Herd"; "It Ain't Easy Being Cheesey"; and, "Cheesehead or Dead."

proached Mr. Papke with the idea of making cheese wedge hats out of foam. In fact, he displayed to Mr. Papke a prototype of what he had in mind. During that conversation, Mr. Bruno told Mr. Papke that he had first gotten his idea at a Brewers' game where he had noticed that there were people wearing cardboard pieces that looked like cheese on their heads.

Messrs. Papke and Bruno decided to undertake efforts to manufacture and distribute such cheese wedge hats. According to Mr. Papke, they attempted to sell the cheese wedge hats any place that they could, i.e., at stores, gas stations and bars. According to Mr. Papke, the cheese wedge hats produced by Messrs. Papke and Bruno did not have any copyright notice affixed thereto or imprinted thereon. Instead, the cheese wedge hats had a return address sticker placed on the underside portion of the hat. Mr. Papke produced at the hearing one of the earliest-produced cheese wedge hats, which he still had in his possession. The hat contained a return address sticker. It reads: "S & R Model and Pattern 112 Henry Street, P.O. Box 131, Dousman, WI 53118 (414) 965–2967." Other than this label, there were no further markings placed on the hats produced by the partnership. Most significantly, neither on this label nor on any other part of the hats was a notice of copyright, or a "©," placed.

Shortly after the partnership began to produce the cheese wedge hats, the name of the entity under which the cheese wedge hats were marketed was changed to Foamation. However, Foamation was not incorporated until July 1993. In the meantime, and up until the dissolution of the partnership, (June 2, 1989), Messrs. Papke and Bruno continued to market the cheese wedge hats. At no time during that period of time, however, was a copyright notice placed on any of the cheese wedge hats. In fact, Mr. Papke testified that he did not recall ever even discussing the subject of copyright with Mr. Bruno while they were operating as partners.

Mr. Papke further testified that, as recently as two to three months before the preliminary injunction hearing, he had ob-

tained another foam cheese wedge hat from Mr. Bruno. That particular hat was received as an exhibit during the preliminary injunction hearing. On the crown of that portion of the hat intended to be placed on the head, there appears to be the following words melted into the foam: "Foamation, Inc., Milwaukee, WI" Thereafter, there appear to be several numbers, the first being "1," the last being "7." Without being told that those numbers are "1987," one would not be able to decipher them.[4]

Although Mr. Papke was not in a position to testify what sort of markings might have been put on the foam cheese wedge hats produced by Foamation after the dissolution of the partnership, he opined that more than 1,000 cheese wedge hats had been manufactured and sold by Mr. Bruno and him before the dissolution of the partnership. He based this opinion on a diary that his wife had kept.

Finally, Mr. Papke testified that he saw an ad in the **Oconomowoc Enterprise** newspaper on Monday, November 18, 1996. That ad, a copy of which was introduced during the preliminary injunction hearing, reads as follows:

CHEESEHEAD™ HATS. If you have a hat or know someone who owns one, which was purchased before March 1, 1996 but which has no copyright notice of "Foamation, Inc. © 1987", please mark the hat with that notice using a marker such as a pen or call us for a label. Please call if you have any questions. Foamation, Inc. 414–481–3337. Thank you.

Mr. Papke's testimony was followed by that of Mary Beth LaDuke Nickel. Ms. Nickel worked at Foamation from December 1994 to January 11, 1996. During her employment at Foamation she performed a wide variety of tasks. She acted as secretary/receptionist; she trimmed the foam cheese wedge hats and boxed them; and, she cleaned the molds used to make the hats. As a result, she became familiar with the company logo that was placed on the hats during the molding process. According to Ms. Nickel, the logo said: "Foamation, Inc., Milwaukee, Wis." However, Ms. Nickel was never told that all hats had to have a logo on them.

---

**4.** This conclusion is mine, based upon an examination of the hat.

Indeed, she saw hats with no logo on them at all.

At the hearing she produced her son's cheese wedge hat. She testified that she had obtained it while she was working at Foamation in either November or December 1995. Her son's hat, marked as Exhibit 12 during the hearing, has no company logo on it. Ms. Nickel was specifically aware of a number of cheese wedge hats leaving Foamation without any logo on them. Specifically, she recalled that some retailers wanted no logo on the hats so that people purchasing the hats from those retailers would not be able to circumvent the retailer and go directly to Foamation to purchase hats.

Ms. Nickel testified that, at one point during the period of time she worked at Foamation, she was instructed to use an ink stamp to place Foamation's logo on the cheese wedge hats. She recalled that the words produced by the ink stamp were "Foamation, 1–800–FOAM–FUN." She further testified that, in her estimation, the number of hats that had gone out with no logo could be as many as 25% on any given day. And, she estimated that during her 13 month term of employment with Foamation, approximately 27,000 foam cheese hats were produced.

Mary Lee Deutsch testified that she was a reporter for the **Waukesha Freeman** in August 1988. On August 17, 1988, she interviewed Ralph Bruno who, at that time, was still Mr. Papke's partner. During the course of that interview, which concerned the production and marketing of the foam cheese wedge hats, Ralph Bruno told her that the cheesehead hat was his brainchild, one that came to him after attending a Brewer's/White Sox game. According to Mr. Bruno, Chicago fans kept calling the Wisconsin fans "cheeseheads." In the words of Mr. Bruno, "People started putting cardboard boxes on their heads, trying to make it look like a wedge of cheese.... After the game [I] went home and cut a piece of foam into the shape of cheese." In this regard, Ms. Deutsch corroborated the testimony of Mr. Papke. More significantly, the sequence of events as recounted by Mr. Papke, Ms. Deutsch and Mr. Wojciechowski fit like a glove. Accordingly, one would conclude that Mr. Bruno first got the idea of a hat shaped like a cheese wedge from seeing Mr. Wojciechowski at the White Sox–Brewers game on April 21, 1987.

Which takes me to the testimony of Mr. Bruno.

Mr. Bruno testified that Mr. Papke was incorrect when he said that Mr. Bruno had told him that he got the idea of the cheese hat from seeing people wearing cardboard cheese-shaped hats at a Brewers' game. Mr. Bruno also averred that Ms. Deutsch was incorrect when she testified that Mr. Bruno had told her virtually the same thing.

Instead, according to Mr. Bruno, he himself had seen, or heard about, White Sox fans referring to Brewers fans as "cheeseheads." Since he was planning to go to a game he thought he would make a cheese wedge hat to wear at the game. And so, he carved a cheese wedge out of a foam seat, placed holes in the foam, and spray painted the holes. He then wore it to the Brewers game that same day.

The difficulty with Mr. Bruno's testimony is that it directly contradicts the testimony of Mr. Papke and Ms. Deutsch, who have no motive to fabricate their testimony. Moreover, one of the exhibits introduced during the preliminary injunction hearing is a copy of an invoice dated May 1, 1987, from Plast–O–Meric Incorporated. The invoice is for substantial quantities of resin, iso, and mold release, that were sold to S & R Model & Pattern. These materials were used to make the cheese wedge hats. According to Mr. Bruno, however, this was not the first quantity of materials used to make cheese wedge hats. To the contrary, according to Mr. Bruno, for about three weeks prior to May 1, 1987, he had been making cheese wedge hats using 5–gallon pail quantities of materials. And, before he began to use the 5–gallon pail quantities of materials, he had taken two days to construct the first mold to be used in making the foam cheese wedge hats.

A quick review of a calendar would reveal that twenty-three days prior to May 1, 1987, was April 8, 1987. And, according to the official Brewers schedule for 1987, the Brewers opened their season at home on April 6th against the Boston Red Sox. They did not

play on the 7th, and did not play the Chicago White Sox until April 20th in Chicago. Thus, the sequence of events offered by Mr. Bruno does not ring true.[5]

In short, the testimony of Ralph Bruno regarding where and when he first came up with the idea to make the foam cheese wedge hats is suspect and, for purposes of the pending motion, I do not credit it. Instead, based on the testimony and exhibits produced during the hearing, I conclude it likely, at least for purposes of this motion, that it was Mr. Bruno's viewing of Mr. Wojciechowski's cardboard cheese wedge hat that first gave him the idea of making a foam cheese wedge hat.

Also, during Mr. Bruno's testimony, he produced two metal plates, both of which read, "Foamation Milwaukee, WI © 1987." He testified that similar plates were used in the molding process for imprinting the Foamation logo and its copyright notice on the hats as early as 1989.[6] Once again, I find such testimony suspect. Quite simply, the evidence would suggest otherwise.

First of all, there were eight Foamation cheese wedge hats that were introduced as exhibits during the course of the preliminary injunction hearing. As stated above, one of them (Exhibit #2) is Mr. Papke's. It does not contain a copyright notice. Exhibit #1 is another Foamation cheese wedge hat. It is also Mr. Papke's. It also does not contain any copyright notice.

Exhibit #6 is the cheese wedge hat that belongs to Mary Nickel's son. It does not contain any copyright notice. In fact, it does not contain the Foamation logo or anything else. And, according to Ms. Nickel, she obtained it in November or December of 1995 while she was working for Foamation.

Furthermore, Foamation did not apply for a copyright registration until February 20, 1996. That it ran an ad in the **Oconomowoc Enterprise** in November of 1996 requesting that any owners of "cheeseheads" produced by Foamation and purchased prior to March

1, 1996, mark the hat with a copyright notice, would strongly suggest that there was no copyright notice placed on Foamation cheese wedge hats prior to March 1996.

Finally, Thomas Wedeward testified during the course of the hearing. At stated, Mr. Wedeward is the owner of Scofield, having acquired it on either March 17, 1987, or 1988.[7]

According to Mr. Wedeward, in late 1995 some of Scofield's customers, which are located throughout the United States, inquired whether or not Scofield would be able to supply them with cheese wedge hats. After doing some research on his own, and then through legal counsel, Mr. Wedeward came to the conclusion that there were no legal impediments to Scofield's being able to produce and distribute cheese wedge hats. Specifically, at the time that he undertook his investigation there was no copyright registration on file for a cheese wedge hat. Consequently, Scofield went forward and began to manufacture cheese wedge hats and to distribute them to its customers. Scofield called these cheese wedge hats "Cheese Tops."

Sometime during the summer of 1996, and after Scofield had begun distributing "Cheese Tops," Foamation, both through its general manager and through its legal counsel (but, not the same legal counsel who represents Foamation in this lawsuit) began to contact Scofield's customers. Customers, including Walgreens, were told, among other things, that Foamation had a copyright to the "cheesehead" product, that any encroachment upon such copyright would be a violation of Foamation's rights, and that a violation of "intellectual property rights [carried] criminal penalties and sanctions under both Wisconsin and federal laws." A written communication from Foamation to Walgreens further stated, "no doubt you have known that [Foamation] has marked its hat with a

---

5. Indeed, at one point in his testimony Mr. Bruno stated that he made his first foam cheese wedge hat on April 4 or 5, 1987.

6. He acknowledged that before the use of such plates commenced, approximately 1,500 cheese wedge hats had been sold without a copyright notice having been imprinted thereon.

7. According to Mr. Wedeward, Scofield has had a good reputation with its 1,500–2,000 customers. In fact, up until this point, Scofield had never been accused of selling "counterfeit" items to its customers.

**1294**

copyright notice since 1987." (Exhibit # 15, letter of July 16, 1996, to Walgreens Company.) In that same communication, Walgreens was requested to "cease and desist from any and all infringements" and to "account for past infringement in order that [Foamation] can settle that matter of damages to which [Foamation] is entitled."

In addition to sending communications to Scofield customers, Ad Cetera issued a press release on behalf of Foamation. In that press release, which was issued on September 13–15, 1996, and which was distributed to members of print, radio and television media throughout Wisconsin and the United States, the following assertions were made:

Foamation Inc., the Milwaukee company that created and manufactures the world famous Cheesehead ™ hat has filed suit in Federal Court against a Menominee Falls, (WI) based company for distributing counterfeit hats.

\* \* \* \* \* \*

Foamation's Cheesehead hat is fully protected by United States copyright trademark and trade dress laws since January of 1987. Original Cheesehead ™ hats are identifiable by the imprint inside stating "Foamation Inc. Milwaukee, WI 1987 © Cheeseheads ™."

All stores and vendors carrying the counterfeits are to be named in a second lawsuit that will be filed shortly in Federal Court. Under United States copyright law, companies—and their principals—who are found guilty of infringement are liable for all costs and attorney's fees in addition to damages.

\* \* \* \* \* \*

... The Cheesehead ™ hat has become synonymous with America's Dairyland ever since Ralph Bruno created and wore the original to a Milwaukee Brewers game in 1987 ...

Not surprisingly, a number of Scofield's customers, after receiving either written communications from Foamation or becoming aware of the press release, contacted Scofield. In some instances they demanded that Scofield take back its cheese wedge hats. In other instances they cancelled all orders for "Cheese Tops." Among the customers that took such action were Sentry Foods and Walgreens.

Mr. Wedeward testified that there was no way of knowing how many Scofield customers had elected to not place orders for "Cheese Tops" because of this lawsuit and because of the allegations that had been made, both within and outside of the lawsuit. For that reason he could not say how many sales had been lost because of Foamation's allegations.

Finally, Exhibits # 21, # 22, # 23, # 24, and # 37 were introduced during the hearing. They are Foamation cheese wedge hats that were purchased either by or at the behest of Thomas Wedeward, the owner of Scofield. These were all purchased during the period from June 1996, up to November 20, 1996. None of them has a copyright notice; or, if they do, it is illegible.

### Analysis

A party seeking a preliminary injunction must demonstrate: "(1) some likelihood of prevailing on the merits; and, (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied." *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994). If the movant establishes both of those elements, "the court must consider: (3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm the movant will suffer if relief is denied; and, (4) the public interest, meaning the effect that granting or denying the injunction will have on non-parties." *Id.* When applying this standard to requests for preliminary injunctive relief, the Seventh Circuit has adopted a "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side. *See, Abbott Laboratories v. Mead Johnson and Company,* 971 F.2d 6, 12 (7th Cir.1992).

Scofield argues that Foamation and Ad Cetera have violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of facts, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services or commercial activities

shall be liable in a civil action by any person who believes that he or she is or likely to be damaged by such act.

15 U.S.C. § 1125(a).

■■■ In order to establish a violation of § 43(a) of the Lanham Act, Scofield must prove: (1) Foamation made false representations about its own or Scofield's product; (2) the misrepresented products travel in interstate commerce; (3) the misrepresentations deceive or are likely to deceive a substantial segment of the intended audience; and, (4) the misrepresentations are material (likely to influence a purchasing decision) and have caused or are likely to cause injury. *Brandt Consolidated, Inc. v. Agrimar Corp.*, 801 F.Supp. 164, 174 (C.D.Ill.1992). Unlike a claim for tortious interference based on infringement warnings directed to third parties, bad faith is not an element of a § 43(a) claim. *Id.*

Section 43(a)'s prohibition against making false and misleading claims regarding one's own products has specifically been construed to reach false claims of copyright ownership and falsely placing a copyright notice on one's own product. *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 37 (2d Cir.1982); *EFS Marketing, Inc. v. Russ Berrie & Company, Inc.*, 836 F.Supp. 128, 133 (S.D.N.Y.1993) (enjoining defendant from placing copyright notice on troll dolls); *Sun-*

*set Lamp Corp. v. Alsy Corp.*, 698 F.Supp. 1146, 1154 (S.D.N.Y.1988) (enjoining distribution of lamps bearing copyright notices).

■■■ As stated above, Foamation filed a copyright registration in February 1996. A putative copyright owner, such as Foamation, is entitled to a presumption of validity and ownership of such copyright, but only if the registration is made within five years of the first publication of the copyrighted work. For a registration obtained more than five years after first publication, the statute provides that the evidentiary weight to be given to the registration is within the court's discretion. 17 U.S.C. § 410(c). *Sem–Torq Inc. v. K Mart Corporation*, 936 F.2d 851 (6th Cir.1991). In other words, the "presumption of validity to a certificate of copyright registration 'merely orders the burdens of proof. [A party is] not ordinarily [to] be forced in the first instance to prove all of the multitude of facts that underline the validity of the copyright unless the [opposing party], by effectively challenging them, shifts the burden of doing so to the [party claiming the copyright].'" *Carol Barnhart, Inc. v. Economy Cover Corporation*, 773 F.2d 411, 414 (2d Cir.1985).

Under the Copyright Act of 1976, as it existed prior to amendments that took effect March 1, 1989, publication of a work without proper copyright notice dedicates the work to the public domain. *Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517 (7th Cir.1996). And copyright forfeiture resulting from such publication, "is 'effectuated by operation of law regardless of the intent of the copyright owner.'" *Id.*, at 520.

One statutory exception to the forfeiture of copyright protection due to lack of notice arises if the notice has been omitted from "no more than a relatively small number of copies." 17 U.S.C. § 405(a)(1). Having said this, however, notice being omitted from 2,500 of 100,000 copies has been held to be more than a relatively small number of copies. *Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.*, 785 F.2d 897 (11th Cir.1986). Similarly, 710 out of 28,000 has been held not to satisfy the exception. *Wabash Publishing Co. v. Flana-*

*gan,* 10 U.S.P.Q.2d 1714 1989 WL 32939 (N.D.Ill.1989).

■ It is objectively unreasonable to pursue a copyright infringement claim despite the issuance of a certification of registration where the plaintiff has not properly acquired title to the copyright and where the copyright application includes material misrepresentations and omissions. *Budget Cinema, Inc. v. Watertower Associates,* 81 F.3d 729 (7th Cir.1996). In this connection, where the copyright claimant is not the author, the copyright statute requires the copyright application include "a brief statement of how the claimant obtained ownership of the copyright." 17 U.S.C. § 409(5). Furthermore, a copyright applicant is required to identify any "preexisting work or works [which the claimed work] is based on or incorporates" as provided in § 6 of the copyright application. 17 U.S.C. 409(9). Not surprisingly, willfully failing to state a fact, (or willfully misstating a fact), which may have caused the copyright office to reject the application is grounds for invalidating the registration. M. Nimmer & D. Nimmer, *Nimmer on Copyright,* § 7.20 at 7–202. A registration thus obtained is not only invalid, but is "incapable of supporting an infringement action." *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 456 (2d Cir.1989).

■ All of this is so because the Copyright Act protects only "original works of authorship," 17 U.S.C. § 102(a), and courts should invalidate copyright registrations that are obtained without meeting this originality requirement. *EFS Marketing, Inc.,* 836 F.Supp. at 133. An invalidating lack of originality can be established by meeting the same test that a copyright owner must meet to prove infringement: either by direct evidence of copying a preexisting work or by proving access to the preexisting work combined with substantial similarity. *North Coast Industries v. Jason Maxwell, Inc.,* 972 F.2d 1031, 1034 (9th Cir.1992).

If a particular work meets the test for originality, and was created by an employee within the scope of his employment, it may very well be a "work-for-hire." 17 U.S.C. § 101. But, unless the purported owner of a copyright has obtained appropriate assignment or other transfer of the entity for whom the work was prepared, the purported owner cannot obtain a valid copyright, and any copyright obtained by that purported owner "is not valid unless an instrument of conveyance or a note or memorandum of the transfer is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). This is because only the owner of a copyright is entitled to obtain a registration. 17 U.S.C. § 408(a).

■ The Lanham Act authorizes preliminary injunctive relief to prevent a party from making false representations of fact about its own products. *See, e.g., U–Haul International, Inc. v. Jartran, Inc.,* 681 F.2d 1159 (9th Cir.1982). This would include instances where a party has placed an unwarranted copyright notice on its products. In such cases it has been held that the continued presence of such notice "will more probably than not damage" a competitor. *Eden Toys, Inc.,* 697 F.2d at 37. And where damages will be extremely difficult to calculate, injunctive relief may be appropriate to prevent the damage from occurring. *See, e.g., General Leaseways, Inc. v. National Truck Leasing Association,* 744 F.2d 588 (7th Cir.1984).

Moreover, there are other forms of irreparable harm that can result from a violation of the Lanham Act which can properly be halted by the entry of a preliminary injunction. These include the harm which results from a company's customers receiving intimidating notifications of a purported copyright owner's rights.

> There is little doubt Roaco's VASODERM business will be damaged seriously *pendente lite* if Syntex's letter campaign was to continue unhindered. Plaintiff's suit for declaration of non-infringement would be rendered meaningless if, months or years from now when a decision on the merits is made, it had no market share to vindicate.

*T.J. Roaco, Ltd. v. Syntex Pharmaceuticals International, Ltd.,* 227 U.S.P.Q. 1033, 1036 1985 WL 5412 (D.N.J.1985).

■ Bearing all of the above in mind, I am persuaded that the entry of a preliminary injunction is appropriate in this case. First

of all, Scofield has shown requisite likelihood of prevailing on the merits of its claim that Foamation does not have a valid copyright to the "cheese wedge" hat. Based on the evidence presented at the hearing, the likely author of the cheese wedge hat is not Ralph Bruno, but rather, is Amerik Wojciecowski. Moreover, even assuming Mr. Bruno were the author, or that Foamation had some sort of claim to copyright for derivative work,[8] the evidence produced during the hearing persuades me that it was likely not until early 1996 that any copyright notice was placed on Foamation's cheese wedge hats. Even then, the copyright notice was not legible. And, an illegible notice is no notice.

37 CFR § 201.20 provides, in pertinent part, that:

(a) General.

(1) This section specifies examples of methods of affixation and positions of the copyright notice on various types of works that will satisfy the notice requirement of § 401(c) of Title XVII of the United States Code, as amended by Pub.L. 94–553. A notice considered "acceptable" under this regulation shall be considered to satisfy the requirement of that section that it be "affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." As provided by that section, the examples specified in this regulation shall not be considered exhaustive of the methods of affixation and positions giving reasonable notice of the claim of copyright.

\*     \*     \*     \*     \*     \*

(c) Manner of affixation and position generally.

(1) In all cases dealt with in this section, the acceptability of a notice depends upon its being permanently legible to an ordinary user of the work under normal conditions of use, and affixed to the copies in such manner and position that, when affixed it is not concealed from view upon reasonable examination.

\*     \*     \*     \*     \*     \*

(i) Pictorial, graphic and sculptural works. The following constitute examples of acceptable methods of the copyright notice on various forms of pictorial, graphic and sculptural works:

\*     \*     \*     \*     \*     \*

(2) Where a work is reproduced in three-dimensional copies, a notice affixed directly or by means of a label cemented, sewn, or otherwise attached durably, so as to withstand normal use, to any visible portion of the work, or to any base, mounting, framing, or other material on which the copies are durably attached, so as to withstand normal use, or in which they are permanently housed, is acceptable.

(3) Where, because of the size or physical characteristics of the material in which the work is reproduced in copies, it is impossible or extremely impracticable to affix a notice to the copies directly or by means of a durable label, a notice is acceptable if it appears on a tag that is of durable material, so a to withstand normal use, and that is attached to the copy with sufficient durability that it will remain with the copy while it is passing through its normal channels of commerce.

\*     \*     \*     \*     \*     \*

If there were copyright notices affixed to any of Foamation's cheese wedge hats that were introduced during the hearing, they were illegible. As stated above, publication of a work without proper copyright notice dedicates the work to the public domain, unless the notice has been omitted from "no more than a relatively small number of copies." 17 U.S.C. § 405(a)(1).[9]

---

8. As stated earlier in this Decision and Order, material misrepresentations and omissions in a copyright application can result in the invalidation of the registration. Even assuming, arguendo, Foamation were entitled to a copyright, its application would seem to contain a number of misstatements and omissions. For example, Foamation, Inc. is listed as the author of the work. That cannot be, because Foamation, Inc.

did not come into legal existence until July 1993. Moreover, no where on the application is the work listed as one "made for hire." Also, the date of first publication of the work is listed as December 31, 1987. Mr. Bruno himself testified that first publication would have been in April/May 1987.

9. Notably, Mr. Bruno produced no Foamation cheese wedge hats on which there was a legible

On that latter point, Mr. Bruno testified that there were approximately 1500 Foamation cheese wedge hats sold up through the end of 1990, with a total of about 500,000 Foamation cheese wedge hats sold between 1987 and the current date. Counsel for Foamation argues that 1500 is an insignificant amount compared to the big picture, thereby invoking the protection of 17 U.S.C. § 405(a)(1).

In my view, 1500 is not a relatively small number of copies. More significantly, however, and for the reasons stated above, I am persuaded that it is likely that all Foamation cheese wedge hats produced subsequent to 1990, and up until early 1996, were distributed without copyright notices affixed thereto.

Given the foregoing, I am persuaded that Scofield has demonstrated requisite likelihood of success on the merits of its claim that Foamation either did not have a valid copyright or, to the extent that it had any valid copyright in the cheese wedge hat, it forfeited that right by sending thousands of cheese wedge hats out into the market place without appropriate copyright notices affixed thereto.

■ *Erickson, supra,* next requires that I examine whether Scofield has demonstrated an inadequate remedy at law and irreparable harm if preliminary relief is denied. In my opinion, it has. Were the court to not enter a preliminary injunction, Scofield would clearly continue to suffer damage to its reputation and would continue to suffer lost sales, the amount thereof being virtually impossible to ascertain. For that further reason, the entry of a preliminary injunction is appropriate.

■ Before deciding to enter an injunction, however, I must also consider the irrep-

arable harm the nonmovant will suffer if preliminary relief is granted balanced against the irreparable harm to the movant if relief is denied. *Erickson,* 13 F.3d at 1067. As stated, Scofield will, in my view, suffer unrecoverable losses (precisely because it will not be able to prove the amount thereof) if Foamation is allowed to continue to publicly assert, and represent to Scofield's customers, that Foamation has a valid copyright which Scofield is infringing. Balanced against this, there would be little, if any, harm to Foamation were the preliminary injunction ultimately determined to have been improvidently entered. After all, Scofield will have records showing its sales and the revenue generated from sales of cheese wedge hats (Cheese Tops). If it were ultimately determined that Foamation does, indeed, have a valid copyright, the losses it will have suffered by virtue of Scofield's infringement of the same will be ascertainable by merely examining Scofield's sales records.

■ This gets me to the last consideration—the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Erickson,* 13 F.3d at 1067. In my opinion, the public interest is generally best served by robust competition in the marketplace. Competition in the cheese wedge hat market is no exception. As stated, if it were to be ultimately determined that a preliminary injunction was improvidently entered, the court will be able to readily ascertain the amount of revenue each company generated by sales of their respective cheese wedge hats. On the other hand, if it were to be ultimately determined that neither party has a valid copyright claim, then neither company will have been harmed, and the public will have benefited from an abundant quantity, and ever improving quality, of cheese wedge hats.[10]

copyright notice. Mr. Bruno did testify that he could make out the © on at least one of the Foamation cheese wedge hats that had been marked as an exhibit. But, an objective examination of all cheese wedge hat exhibits reveals no legible copyright notice on any of them. That Mr. Bruno claims the copyright notice on Foamation's hats to be legible does not, thereby, make it legible. To use the words of counsel expressed at the hearing, "The cheesehead speaks for itself."

10. Mr. Wojciechowski has assigned any copyright he may have in his work to Wedeward Enterprises. But, during the oral arguments on the motion for preliminary injunction, I asked counsel for Scofield whether or not the cheese wedge hat is copyrightable at all. He candidly acknowledged that the answer to that question is not clear. Because I do not believe my decision on Scofield's motion for preliminary injunction depends upon a resolution of that issue, I will not hazard an opinion on it at this point. I do note,

■ In conclusion, and for all of the foregoing reasons, I am persuaded that Scofield is entitled to a preliminary injunction.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Foamation, Inc., Ad Cetera Sports Marketing, Inc., and anyone acting in concert with either of those corporations are hereby enjoined and prohibited from making any statements to current and potential Scofield customers, that Foamation owns a valid copyright on the cheese wedge hat and that Scofield's cheese wedge hat infringes Foamation's copyright.

**IT IS FURTHER ORDERED** that Foamation, Inc., Ad Cetera Sports Marketing, Inc., and anyone acting in concert with either of those corporations are enjoined and prohibited from threatening to sue retailers and others in the chain of distribution of Scofield's products on the basis that Foamation owns a valid copyright on the cheese wedge hat and that Scofield's cheese wedge hat infringes such copyright.

**IT IS FURTHER ORDERED** that Foamation, Inc., Ad Cetera Sports Marketing, Inc., and anyone acting in concert with either of those corporations are enjoined and prohibited from placing on, or affixing to, any Foamation cheese wedge hat any notice of copyright, including, but not limited to, the designation "©."

In compliance with Rule 65(c), Fed.R.Civ. P., Scofield is **HEREBY ORDERED** to post a $10,000 bond for the payment of such costs and damages as may be incurred or suffered by Foamation or Ad Cetera in the event they are ultimately found to have been wrongfully enjoined. Such amount shall be posted within 10 days of the date of this order.

**IT IS FURTHER ORDERED** that a scheduling conference will be held on Tuesday, January 14, 1997, at 9:15 a.m. in Room 449, U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, Wisconsin.

---

however, that under the copyright laws, an article with "intrinsic utilitarian function," 17 U.S.C. § 101, is not protected except to the extent that its design incorporates artistic features that can be identified separately from the article's functional elements. Thus, were I to find that both parties' respective hats are "hats and nothing but hats," then it is possible that neither party will be entitled to copyright protection on grounds that its work is too utilitarian in nature to deserve copyright protection. *See, Past Pluto Productions Corp. v. Dana*, 627 F.Supp. 1435, 1442, n. 7 (S.D.N.Y.1986).

EXHIBIT 9

PENGAD-Bayonne, N. J.

Journal photo by Benny Sieu

The Brewers paraded past cheering fans, including a couple of Cheeseheads, after Saturday's victory